The AETNA CASUALTY AND SURETY COMPANY, Plaintiff,

v.

RETAIL LOCAL 906 OF AFL–CIO WELFARE FUND, et al., Defendants.

Max GOLDWEBER and Marcia Berger Hershkowitz, d/b/u the firm name of Goldweber & Hershkowitz, Plaintiffs,

v.

The AETNA CASUALTY AND SURETY COMPANY, Defendant.

Nos. CV 93–1219, CV 93–1242.

United States District Court, E.D. New York.

March 25, 1996.

Lambert, Weiss & Pisano, by Arthur N. Lambert & Susan E. Jaffee, New York City, for plaintiffs.

Perini & Hoerger by Raymond Perini & Maureen S. Hoerger, Hauppauge, N.Y., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

The above-captioned consolidated actions were tried without a jury in November and December 1995. At the conclusion of the trial, this Court reserved decision. The following is this Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

In March 1993, Max Goldweber ("Goldweber") and Marcia Berger Hershkowitz ("Hershkowitz"), d/b/u the firm name of Goldweber & Hershkowitz ("G & H"), com-

**124**

menced an action (the "G & H action") against the Aetna Casualty and Surety Company ("Aetna") in New York Supreme Court, Nassau County, to recover legal fees from Aetna allegedly due and owing G & H for defending, among others, the trustees of Retail Local 906 AFL–CIO Welfare Fund (the "Welfare Fund") in two actions in the United States District Court for the Southern District of New York: (1) *Soanes v. Empire Blue Cross/Blue Shield*, No. 91 Civ. 8698 (JES) (the "Blue Cross action"); and (2) *State Mutual Life Assurance Co. v. Retail Local 906 AFL–CIO Welfare Fund*, No. 91 Civ. 8575 (SJM) (the "State Mutual action").

Subsequently, Aetna commenced an action in this Court (the "Aetna action") against the Welfare Fund and its trustees to rescind a Pension and Welfare Fund Fiduciary Responsibility Insurance Policy issued by Aetna to the Welfare Fund and the Retail Local 906 AFL–CIO Pension Fund (the "Pension Fund") under policy number 73 FF 100698100 BCA (the "FRIP"). In the Aetna action, and by counterclaim in the G & H action, Aetna claims that the Welfare Fund, Goldweber and others concealed from Aetna facts material to the renewal of the FRIP in 1991, in particular, that thousands of "associated members" had been admitted to Retail Local 906 AFL–CIO ("Local 906") solely for participation in the Welfare Fund in a scheme to deceive the Welfare Fund's health insurers.

Aetna then removed the G & H action to this Court, and both the G & H and Aetna actions were consolidated by order dated July 2, 1993.

At all relevant times, Nemiah Soanes ("Soanes") was the president of Local 906 and the administrator and a trustee of the Welfare Fund.

The other trustees of the Welfare Fund were Vincent Fuentes ("Fuentes"), Althea Neblett ("Neblett"), John Economos ("Economos"), George Rosenfeld ("Rosenfeld"), and George Schwartz ("Schwartz"). Soanes, Fuentes and Neblett were employee trustees, and Economos, Rosenfeld and Schwartz were employer trustees.

At all relevant times, Goldweber was the attorney for the Welfare Fund and Local 906, and had been for many years pursuant to retainer agreements. Hershkowitz was a partner of Goldweber in G & H.

In or about the summer of 1990, Soanes and Goldweber became involved with a person named Solomon Sprei ("Sprei"), who developed a scheme to recruit persons to join Local 906 as "associated members." These "associated members" would not be required to be employed by employers who entered into collective bargaining agreements with Local 906. Associated members would pay monthly dues to Local 906 solely to obtain health insurance through the Welfare Fund, and so-called "finder's fee" would be paid to entities controlled by Sprei and to others for bringing in the associated members.

In or before October 1990, Local 906 and Sprei began negotiations to admit associated members to Local 906. Thereafter, numerous meetings between and among Soanes, Goldweber, Hershkowitz, Sprei, and Sprei's attorney, Moshe Katlowitz ("Katlowitz"), were held to implement the scheme.

In October 1990, the Local 906 constitution was amended to allow for associated members. Associated members were not required to be employed by employers who had collective bargaining agreements with Local 906. Indeed, they were not required to be employed, as persons "one time previously employed" were eligible for membership. However, associated members could not vote or participate in Local 906 affairs, even though the constitution of the AFL–CIO International Union (the "International Union") required that all members have equal rights and responsibilities.

In or about October 1990, Local 906, by Soanes, and an entity called The Greater Northeast Business Group, Inc. ("GNBG") executed a document entitled, "Local 906 Collective Bargaining Agreement," dated as of September 1, 1990. Pursuant to § 9.1 and § 9.5 of that agreement, associated members—employed and nonemployed persons—could participate in the Welfare Fund. It did, however, purport to limit nonemployee membership to 10% of the total number of employees and nonemployees for whom

GNBG was to make payment to the Welfare Fund for group health insurance coverage. Nevertheless, this document was not an agreement with any employer and was not a collective bargaining agreement, but was entitled as such as part of the associated member scheme. The evidence established that GNBG, although a purported association acting as an agent for various employers, never had an association with employers at that time or any time thereafter.

Soanes, on behalf of Local 906, also executed a "Union–Finder Agreement," dated as of October 22, 1990, with The Associated Members Brokerage Group, Inc. ("AMBG"), under which AMBG was to act as "Finder" to locate and obtain associated members for Local 906. Section 1(b) of the Union–Finder Agreement defined an associated member as "any person, whether employed or at one time previously employed, who makes a monthly dues payment to [Local 906] in the amount of [twelve dollars]." Similarly, the parties to the agreement provided that "[e]mployers of Associated Members need not enter into a collective bargaining agreement with any person or entity." The agreement also provided that the finder could engage "subfinders" and for the payment of finder's and sub-finder's fees from the money paid by the associated members. Under the agreement, G & H was to receive copies of all notices concerning the agreement.

In addition, Soanes, on behalf of Local 906, executed an "Administration Agreement," dated as of October 22, 1990, with The American Employee Group Benefits Administrator, Inc. ("AEGBA"), under which AEGBA was to "formulate, administer and govern all rights and benefits of Associated Members [to] insurance plans." As in the Union–Finder Agreement, the Administration Agreement similarly provided that an associated member "includes any person, whether employed or not employed, who makes a monthly dues payment to [Local 906] in the amount of [twelve dollars]," and that "[e]mployers of Associated Members need not enter into a collective bargaining agreement with any person or entity." Moreover, as under the Union–Finder Agreement, the Administration Agreement provided that G & H was to receive copies of all notices concerning the agreement.

These various agreements and the amendment of the Local 906 constitution implemented the associated member scheme by permitting enrollment of associated members into Local 906 and, eventually, their participation in the Welfare Fund. Goldweber admitted that he participated with Katlowitz in drafting the various agreements on behalf of Local 906. Moreover, Hershkowitz conceded that G & H participated in the negotiations of the terms of the agreements.

Sprei created GNBG, AMBG and AEGBA (collectively, "Sprei's entities"), all of which were used to implement the associated member scheme. According to Soanes, Sprei said he would hire finders to recruit associated members.

Although Soanes refused to admit that he did not care where, or even if, associated members were employed as long as Local 906 received its dues and the Welfare Fund received its monthly payment for premiums, Soanes admitted such in his testimony in the Blue Cross action.

Soanes claimed that the practice of recruiting associated members was first brought to his attention at a convention of the International Union about 10 years ago as a means of increasing union membership. Astoundingly, Soanes maintained that the International Union approved the associated member scheme. In this respect, Soanes claimed that after Local 906 began taking in associated members, he informed the International Union; and the "[International Union] asked for a copy of the contract which I took to the International [Union's] president that she sent to her attorneys." As a result, the International Union "told" Soanes that Local 906 would have to pay part of the associated members' dues to the International Union. Thereafter, Local 906 agreed to pay $3.75 per month per associated member to the International Union out of the $12 per month dues paid by each associated member. Although Soanes told the International Union's president that Local 906 was receiving less dues from associated members than regular members, the International Union directed

Local 906 to "pay full per capita tax the same as you pay for the regular members."

The FRIP at issue in this action had an effective date of March 23, 1991. The FRIP, subject to various exclusions, terms and conditions, provided:

> The Company [Aetna] will pay on behalf of the Insured [the Welfare Fund] all sums which the Insured shall become legally obligated to pay as Damages on account of any claim made against the Insured for any Wrongful Act and the Company shall have the right and duty to defend such claim against the Insured seeking such Damages, even if any of the allegations of the claim are groundless, false or fraudulent, and may make such investigation and settlement of any claim as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements. (Emphasis omitted.)

The FRIP resulted from the renewal of a FRIP issued by Aetna to the Welfare Fund covering the period March 23, 1990 to March 23, 1991 (the "1990–1991 FRIP").

As the March 23, 1991 renewal date for the FRIP approached, by letter dated February 28, 1991, Aetna issued a notice of nonrenewal of the FRIP, effective May 2, 1991, based upon the Welfare Fund's failure to submit timely renewal underwriting information.

By letter dated April 3, 1991, Goldweber submitted to the Welfare Fund's insurance broker, Simon Paston & Sons Agency, Inc. ("Simon Paston"), the following: (1) the renewal application, dated March 15, 1991 (the "1991 renewal application"); (2) the Welfare Fund's 1989 IRS 5500 form for the fiscal plan year ending January 31, 1990; and (3) the Welfare Fund's audited financial statements as of January 31, 1990. Goldweber testified that he originally submitted the 1991 renewal application on or about March 15, 1991, but that Aetna or Simon Paston lost or misplaced it, so he resubmitted it on or about April 3, 1991.

Goldweber prepared the 1991 renewal application and signed as attorney for the Welfare Fund. Goldweber, the Welfare Fund's accountant, and certain Local 906 employees completed the 1989 IRS 5500 form.

Item 6 on the 1991 renewal application is entitled "PLAN STATUS." Immediately under that heading, the form indicates "Complete the following as to 6 Plans with the largest number of participants." For each plan, the form requests the following information in six columns: "PLAN NAME," "STATUS," "REPORTING YEAR," "ANNUAL CONTRIBUTIONS," "ASSET VALUE," and "NUMBER OF PARTICIPANTS." Goldweber completed this portion of Item 6 by inserting "Retail Local 906 AFL–CIO Welfare Fund" in the column for "PLAN NAME," "1989" in the column for "REPORTING YEAR," and "211" in the column for "NUMBER OF PARTICIPANTS."

The next portion of Item 6, continued on the second page of the application form, is headed "ALL PLANS," under which are requests for eight enumerated categories of information, including: "(4) Total Number of Participants—all plans." Goldweber inserted the response "no change" in the space next to these eight enumerated categories of information.

On the first page of the 1991 renewal application is an area designated "SPONSORSHIP." The four choices from which the applicant can choose are "Sole," "Multiemployer (Collectively-bargained)," "Multiple Employer," and "Other _____." This portion of the form was left unmarked, but the response to question 4 on the 1989 IRS 5500 form submitted therewith indicated that the Welfare Fund was a "[m]ultiple-employer-collectively-bargained plan." There was no indication in the 1991 renewal application that the sponsorship of the plan was no longer "Multiemployer (Collectively-bargained)" due to the admission of associated members.

Aetna contends that by indicating there was no change in, *inter alia,* "(4) Total Number of Participants," Goldweber represented on behalf of the Welfare Fund that as of March 15, 1991, the application date, there was no change in the number of participants in the Welfare Fund from 211.

Goldweber, on the other hand, contends that this latter portion of Item 6 calls for information only as to additional plans not listed in the initial portion of Item 6, where Goldweber included information about the Welfare Fund. The information about the Welfare Fund in the initial portion of Item 6, according to Goldweber, is "historic information" taken from the 1989 IRS 5500, which covers only up to January 31, 1990, nearly fourteen months prior to the 1991 renewal application date. Goldweber maintains that the phrase "no change" was an indication to Aetna that "there's no change in our acquiring, adding or deleting any other plans." Goldweber testified that, for over a decade, the Welfare Fund has been completing its renewal applications with Aetna in a similar fashion. Goldweber also testified that he did not know how many participants were in the Welfare Fund as of date he completed the 1991 renewal application. In his words, he was "reporting for ... two years before." He further testified that no one from Aetna ever asked for any current information concerning the 1991 renewal application, in particular, concerning the number of participants in the Welfare Fund.

The Welfare Fund and Local 906 maintained records of all covered members, including associated members. The regular members of Local 906 were employees of sponsor employers who had collective bargaining agreements with Local 906. During the 10 years prior to the 1991 renewal application, when the Welfare Fund submitted its renewal applications, there were between approximately 200 to 300 members in the Welfare Fund, all of whom were bona fide members of Local 906, employed by employers who had collective bargaining agreements with Local 906. In November 1990, Local 906 admitted its first associated members. By the end of that month, there were 70 associated members participating in the Welfare Fund. In January 1991, there was a rapid increase in the number of associated members, such that by February 1991 the Welfare Fund had least 2,000 associated members. In fact, by around the end of 1991, Soanes conceded that the Welfare Fund had over 8,000 associated members.

Seth Bykofsky ("Bykofsky"), who was a partner at G & H through August 1994, when he left the firm, testified that he, Goldweber and Hershkowitz, knew in January, February and March 1991 that Local 906 and the Welfare Fund had "thousands" of associated members. He based this testimony on his discussions with Goldweber and information G & H received about dues taken in by Local 906 and premium payments made by the Welfare Fund to Blue Cross during those months. From the information about dues and premium payments, he claims, one can "deduce the number of associated members."

It is abundantly clear from the evidence, including Bykofsky's testimony, that Goldweber knew of the substantial growth in the number of associated members during the period prior to the submission of the 1991 renewal application and renewal of the FRIP.

In the meantime, in the fall of 1990, the Welfare Fund and Empire Blue Cross/Blue Shield ("Blue Cross") negotiated a contract to provide health insurance for its associated members for the period commencing November 1, 1990 and ending June 30, 1991. This policy provided health coverage to a participant without requiring the participant to undergo a prior physical examination and without a limitation for any preexisting condition of the participant. It is obvious that the associated member scheme provided a convenient and potentially deceptive way for persons suffering serious preexisting conditions to obtain health insurance without regard to the risks of their insurability.

The Blue Cross contract was a self-certifying policy, whereby the Welfare Fund would calculate its premium based upon the number of associated members who participated in the Welfare Fund. Each month the Welfare Fund received lists of associated members from Sprei's entities, which would remit monthly payments to the Welfare Fund. The Welfare Fund, in turn, made monthly premium payments to Blue Cross (and, after termination of the Blue Cross policy, as discussed below, to its later health insurance provider State Mutual Life Assurance Company of America ("State Mutual")). Local 906 paid the $3.75 "per capita tax" for each

associated member to the International Union out of the $12 per month dues paid by each associated member.

By letter dated February 13, 1991, Blue Cross notified the Welfare Fund that "[d]ue to an increase in enrollment," Blue Cross was entitled to increase the premiums. By letter dated March 6, 1991, Blue Cross explained further that its decision was based on the significant change in the risk it had underwritten due to the "rapid increase" in the Welfare Fund's membership and the nature of that increase.

By letter dated April 30, 1991, Blue Cross terminated its health insurance policy with the Welfare Fund when it discovered that the Welfare Fund had enrolled persons who were not bona fide members of Local 906.

On May 3, 1991, the trustees of the Welfare Fund commenced the Blue Cross action in New York Supreme Court, New York County. By order to show cause, the trustees sought to enjoin Blue Cross from terminating its health insurance policy with the Welfare Fund. The order to show cause was supported by Goldweber's affirmation, which indicated there were approximately 3,500 associated members in the Welfare Fund. At a hearing on May 7, 1991, the parties agreed to enter a stipulation, memorialized later that month, pursuant to which Blue Cross agreed that its policy was to remain in effect through June 30, 1991, at which time the contract would not renew. In this respect, Blue Cross agreed, pursuant to the stipulation, that its policy "had always been in full force and effect without interruption since their respective dates of inception and will continue in full force and effect provided premium payments remain current." In addition, pursuant to the stipulation, Blue Cross was required to pay "all disputed claims," and the Welfare Fund was required to pay Blue Cross $1 million in premiums.

As for Aetna's consideration of the renewal of the FRIP in 1991, James Carson ("Carson") was the Aetna underwriter who received and reviewed the 1991 renewal application form, the 1989 IRS 5500 form, and the audited financial statements, and relied upon them in determining whether to underwrite the FRIP. Carson testified that he relied upon the number of participants listed on the 1991 renewal application to evaluate whether to underwrite the risk, compute the premium, and determine whether any changes may have occurred in the size and scope of the plan. According to Carson, the phrase "no change" on the second page of the 1991 renewal application indicated that there was no material change in the status of the plan as of the date of the application compared to the previous application, and that he expected that all material changes from the previous application would have been communicated in the 1991 renewal application.

Based on the 1991 renewal application and related material submitted to Aetna, by letter dated April 9, 1991, Carson offered to renew the FRIP with a combined $1 million policy for both the Welfare and Pension Funds. Previously, the Welfare Fund and the Pension Fund had separate $1 million policies.

By letter dated May 8, 1991, Goldweber responded to Carson's April 9, 1991 letter. In his May 8, 1991 letter, Goldweber, on behalf of the Welfare Fund, sought a limit of $2 million on the FRIP, but Aetna never agreed to this request, and, as of that date, the FRIP had not been renewed.

By a May 28, 1991 letter, Carson notified the Welfare Fund, through Simon Paston, that pursuant to the February 28, 1991 notice of nonrenewal, the FRIP was in nonrenewal status, and he inquired whether the Welfare Fund would be accepting the $1 million policy offered in Carson's April 9, 1991 letter.

In a response that same day, the Welfare Fund, through Simon Paston, accepted Aetna's offer as proposed in the April 9, 1991 letter. Aetna then issued the FRIP on June 4, 1991, effective as of March 23, 1991, for the period March 23, 1991 to March 23, 1992.

Meanwhile, on May 23, 1991, Blue Cross answered the complaint in the Blue Cross action and asserted counterclaims. In its sixth affirmative defense and first counterclaim, Blue Cross alleged that the trustees committed fraud against Blue Cross by including in the Welfare Fund persons who were not bona fide members of Local 906.

While the 1991 renewal application was pending, and prior to Aetna's renewal of the FRIP, the Welfare Fund and Goldweber did not disclose to, and concealed from, Aetna: (1) that the actual number of participants in the Welfare Fund was in the thousands; (2) that associated members were not required to be employed by employers with collective bargaining agreements with Local 906, thereby changing the sponsorship of the plan so that it was no longer a "multiple-employer-collectively-bargained plan"; (3) that Blue Cross attempted to terminate its health insurance policy with the Welfare Fund; (4) that the Welfare Fund commenced the Blue Cross action, in which Blue Cross asserted a counterclaim for fraud against the trustees; and (5) that Local 906 had executed the purported Collective Bargaining Agreement, the Union–Finder Agreement, and the Administration Agreement with Sprei's entities, and that Goldweber and G & H participated in drafting and negotiating the terms of those agreements.

Carson testified that if he had known, prior to approving the 1991 renewal application, that the Welfare Fund contained thousands of participants who were not employees of employer-sponsors and collectively-bargained-for, then Aetna would not have issued the FRIP. In addition, had he been advised that the Welfare Fund was in litigation with Blue Cross, he would have conducted further investigation.

Despite the parties' stipulation in the Blue Cross action, Blue Cross subsequently disputed the coverage of associated members. Although Goldweber initially testified otherwise, it is apparent that the stipulation did not resolve the action.[1] Indeed, Bykofsky, who actively participated in that action, testified that the action was vigorously litigated between May 1991 and January 1992. In June 1991, the trustees moved to compel Blue Cross to pay disputed claims, and at a hearing before Supreme Court Justice Beatrice Shainswit, the court denied the trustees'

motion. Proceedings also occurred in the Appellate Division, First Department, which denied the trustees' motion for a preliminary injunction and motion to hold Blue Cross in contempt. In November 1991, Blue Cross and the Welfare Fund filed motions for summary judgment. Throughout this time, Goldweber admitted that Local 906 paid for the prosecution of the action and defense of Blue Cross's counterclaims.

In November 1991, Blue Cross commenced a third-party action against Local 906, Sprei's entities, Sprei, and Soanes, asserting claims for, *inter alia*, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.* The Blue Cross action was removed to the United States District Court for the Southern District of New York. The factual allegations contained in the third-party complaint are similar to those contained in Blue Cross's counterclaims against the trustees.

After Blue Cross terminated its policy with the Welfare Fund, the Welfare Fund contracted with State Mutual for health insurance benefits.

On December 20, 1991, State Mutual commenced the State Mutual action against the Welfare Fund, Local 906, the trustees of the Welfare Fund, Sprei's entities, Sprei and Katlowitz, alleging, *inter alia*, misrepresentations in procuring the State Mutual health insurance policy.

By separate letters dated January 9, 1992, the Welfare Fund forwarded copies of Blue Cross's third-party complaint and State Mutual's complaint to Simon Paston. Both letters stated that the trustees: (1) strongly deny any wrongdoing; and (2) wished G & H to represent them. Simon Paston forwarded the letters to Aetna. The January 9, 1992 letters were the first notice Aetna received of those actions, notwithstanding that the Blue Cross action, including Blue Cross's counter-

---

1. In relevant part, the stipulation provided:
   No provision of this Stipulation shall be deemed ... to determine and/or affect the rights and/or obligations of the respective parties under the contracts of insurance which are the subject of this Stipulation, except as ex-
   pressly agreed.... The execution of this Stipulation in no way constitutes an admission of liability and/or culpable conduct on the part of any party, nor does it constitute the waiver of any remedy available to the respective parties, either at law or in equity.

claim for fraud, had been pending since May 1991.

By letter dated March 6, 1992, an Aetna claims representative, Leo Davin ("Davin"), acknowledged receipt of the third-party complaint. Davin explained that based on the FRIP definition of "insured," Soanes was insured only in his capacity as a Welfare Fund trustee. Soanes was not afforded coverage for his actions while acting in his capacity as an officer of Local 906. The letter reserved Aetna's rights to conduct an investigation and to disclaim coverage at a later date.

By a separate letter dated March 6, 1992, Davin acknowledged receipt of the State Mutual complaint. Davin explained that pursuant to the terms and conditions of the FRIP, including the definition of "insured," it would defend the Welfare Fund, Economos, Rosenfeld and Schwartz, as trustees. The letter reserved Aetna's rights to conduct an investigation and to disclaim coverage at a later date.

By letter dated March 11, 1992, Hershkowitz advised Aetna that G & H's regular billing rate was $225.00 per hour.

Thereafter, William Foley ("Foley"), another Aetna claims representative, was assigned to the matter. As reflected in a letter from Foley to G & H dated April 15, 1992, Aetna agreed to a fee of $190 per hour for G & H to defend the "insureds" in the Blue Cross action and the State Mutual action.

On or about April 16, 1992, Foley notified G & H that in the Blue Cross action the only third-party defendant which qualified as an "insured" under the FRIP was Soanes in his capacity as administrator and trustee of the Welfare Fund, not as an officer of Local 906.

On or about April 16, 1992, Foley notified G & H that in the State Mutual action, the Welfare Fund, Economos, Rosenfeld and Schwartz qualified as "insureds" under the Policy.

Later in the spring of 1992, Foley went to G & H's office to review documents. While at G & H, no one directed Foley's attention to any specific documents. When Foley requested that Goldweber provide him with an explanation and evaluation of the Blue Cross claim, Goldweber told Foley that the Blue Cross third-party action was merely a "stalling tactic" because Blue Cross was "bankrupt" and was "unable to pay the members' claims."

In the Blue Cross action, G & H represented Soanes, Neblett, and Fuentes (in their capacities as the three employee trustees, and Soanes also as president of Local 906); Schwartz, Rosenfeld, and Economos (in their capacities as the three employer trustees); Morton Nathan, Peter Janis and Lorinda Thomas (three claimant beneficiaries, who were associated members and whose claims were not paid by Blue Cross); and Local 906. Clearly, various of these parties had potential claims against the others. For example, the Welfare Fund's trustees (except Soanes) had potential claims against Local 906 and Soanes as president of Local 906. No such claims were ever asserted. More significantly, Goldweber and G & H had clear conflicts of interest based on potential claims against Goldweber for participating in the associated member scheme.

Goldweber and G & H faced similar conflicts of interest in the State Mutual action, in which they represented both Local 906 and the Welfare Fund, and never asserted potential cross-claims.

Although Goldweber claims he answered all of Foley's questions and did not mislead him in any way, Goldweber and G & H never advised Foley or anyone from Aetna that he and Hershkowitz participated in drafting and negotiating the agreements which implemented the associated member scheme or that this scheme led to the disputes with Blue Cross and State Mutual and the eventual Blue Cross and State Mutual actions. In addition, Goldweber and G & H never advised Foley or anyone from Aetna of the possible conflicts of interest in G & H's representation of various parties in the Blue Cross and State Mutual actions.

In the meantime, as the March 23, 1992 renewal date approached, Aetna issued a 60-day notice of nonrenewal, dated March 19, 1992, based upon the Welfare Fund's failure to submit timely and complete renewal underwriting information.

At or about that time, the Welfare Fund submitted a renewal application for the

FRIP, signed by Soanes and dated "January, 1992" (the "1992 renewal application"). The Welfare Fund's 1990 IRS 5500 form for the fiscal plan year ending January 31, 1991, signed by Soanes and dated August 26, 1991, accompanied the 1992 renewal application. The 1992 renewal application indicated that there were 201 participants in the Welfare Fund. The second page of the 1990 IRS 5500 form indicated that the number of participants was 201. Goldweber admits that he wrote this number on the form. As of February 2, 1991, there were over 2,000 associated members and 201 regular members in the Welfare Fund.

On May 20, 1992, Aetna issued another notice of nonrenewal, extending the effective date of the previous nonrenewal notice to July 22, 1992. The notice specifically referred to section X of the FRIP, under which, Aetna, at the option of the Welfare Fund, must extend the reporting period to 12 months after the effective date of termination, cancellation or nonrenewal. On July 7, 1992, the Welfare Fund exercised its option under section X. Aetna issued a "Change Endorsement," effective July 22, 1992, which provided for an additional 12–month reporting period for claims made against the Welfare Fund. The final nonrenewal for the FRIP was July 22, 1992.

G & H submitted its first bills to Aetna on April 1, 1992. Through September 1992, by four checks, Aetna paid G & H a total of $63,355.51 in legal fees. In the fall of 1992, Aetna discovered that the Welfare Fund, with the participation of Goldweber, made material misrepresentations in the 1991 renewal application, at which time Foley told Goldweber that Aetna would not pay G & H's bills because of the alleged material misrepresentations. In addition, Goldweber was advised that Aetna had retained counsel to investigate G & H's billing, the alleged material misrepresentations in the 1991 renewal application, and the Blue Cross and State Mutual actions.

## CONCLUSIONS OF LAW

### I. *Aetna's Rescission Claim*

The parties agree that New York law governs this diversity action. Under New York law, "an insurance policy issued in reliance on material misrepresentations is void from its inception." *Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan,* 77 F.3d 48, 52 (2d Cir.1996) (citing N.Y.Ins.Law. § 3105). To rescind a policy of insurance, the insurer has the burden to prove that the applicant for insurance made a misrepresentation and that had the insurer known the truth it would not have issued the exact same policy it did issue. *Vella v. Equitable Life Assurance Soc.,* 887 F.2d 388, 391 (2d Cir. 1989); *Mutual Benefit Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d 30, 32–34 (2d Cir.1988). As the Second Circuit explained in *JMR Electronics:*

> A "misrepresentation" is defined by statute as a false "statement as to past or present fact, made to the insurer ... at or before the making of the insurance contract as an inducement to the making thereof." N.Y. Ins. Law § 3105(a) (McKinney 1985). A representation is "material" if "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." *Id.* § 3105(b). Case law has somewhat broadened the materiality inquiry: "The question is not whether the company *might have issued* the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application which it *might otherwise have refused.*"

*JMR Electronics,* 848 F.2d at 32 (emphasis in original) (quoting *Geer v. Union Mutual Life Ins. Co.,* 273 N.Y. 261, 269, 7 N.E.2d 125 (1937)). Thus, the insurer need not prove that it would not have issued any policy at all, but that the policy in question would not have been issued. *JMR Electronics,* 848 F.2d at 32–33; *Mutual Benefit Life Ins. Co. v. Morley,* 722 F.Supp. 1048, 1051 (S.D.N.Y. 1989).

Moreover, the " '[f]ailure to disclose is as much a misrepresentation as a false affirmative statement.' " *Morley,* 722 F.Supp. at 1051 (quoting *Vander Veer v. Continental Casualty Co.,* 34 N.Y.2d 50, 356

N.Y.S.2d 13, 14, 312 N.E.2d 156, 157 (1974)). Nevertheless, "an applicant is under no duty to volunteer information where no question plainly and directly requires it to be furnished." *Vella*, 887 F.2d at 392; *see also Sebring v. Fidelity–Phenix Fire Ins. Co.*, 255 N.Y. 382, 386, 174 N.E. 761 (1931) ("If fraud be absent, the assured may remain silent in respect to many matters concerning which the underwriter fails to question him."). However, where the nondisclosure, as to a matter which the insured has not been directly asked, constitutes fraud, the policy may be voided. *Sebring*, 255 N.Y. at 387, 174 N.E. 761. To constitute fraud, the nondisclosure must be "in bad faith with intent to mislead the insurer." *Id.* In other words, "[i]f the applicant is aware of the existence of some circumstance which he knows would influence the insurer in acting upon his application, good faith requires him to disclose that circumstance, though unasked." *Id.; see also Lighton v. Madison–Onondaga Mutual Fire Ins. Co.*, 106 A.D.2d 892, 483 N.Y.S.2d 515, 516 (4th Dep't 1984) ("Fraudulent concealment may void an insurance policy, even if the fact concealed was one not inquired into by the insurer.").

■ Upon considering the parties' opposing interpretations of the 1991 renewal application, particularly, the significance of the phrase "no change" in Item 6, and the circumstances occurring prior to Aetna's renewal of the FRIP in or about June 1991, this Court concludes that Goldweber's and the Welfare Fund's concealment of the tremendous increase in membership due to the associated member scheme, the change in the status of the plan from a multiemployer-collectively-bargained-for plan, and Blue Cross's purported termination of its policy and the related Blue Cross action (including Blue Cross's counterclaim for fraud), individually and together, constituted a designed and intentional withholding of material facts which the Welfare Fund in honesty and good faith ought to have communicated to Aetna in connection with the 1991 renewal application. *See Sebring*, 255 N.Y. at 386, 174 N.E. 761. Information of this nature clearly was relevant and material to Aetna's decision whether to issue the FRIP it did issue. This Court does not agree with the Welfare Fund that

Aetna, by practice, relied only on historic information (*i.e.*, information approximately 14–months old by the renewal application dates) as to the number of Welfare Fund members and the status of the plan, and, therefore, had no interest in current information. The evidence presented at trial leaves little doubt that the Welfare Fund and Goldweber knew that the tremendous increase in membership and change in status of the plan were facts material to Aetna's consideration of the 1991 renewal application. Nondisclosure of current membership information and plan status in connection with the 1991 renewal application, prior to renewal and delivery of the policy in June 1991, constituted material misrepresentations by the insured sufficient to void the FRIP.

■ Although this Court is troubled by Aetna's questionable diligence in reviewing materials from the Blue Cross and State Mutual actions in or after January 1992, and in determining to retain Goldweber and G & H to defend its insureds in those actions, this Court cannot say that before renewing the FRIP in 1991 and retaining G & H in or about the spring of 1992, Aetna knew, but disregarded, the tremendous increase in membership in Local 906 or the Welfare Fund or the change in collective bargaining status of the Welfare Fund. Goldweber and the Welfare Fund had these facts readily available, but knowingly concealed them from Aetna with the intent and design to defraud Aetna. There was no waiver by Aetna of the right to claim rescission of the FRIP based on these material misrepresentations, which Aetna did not discover until about the fall of 1992.

By concealing, during the pendency of the 1991 renewal application, (1) the tremendous increase in membership and change in collective bargaining status, and (2) the disputes over the Welfare Fund's health insurance policies and the litigation related thereto (including the claims of fraud against the Welfare Fund's trustees), the Welfare Fund, with Goldweber's participation, caused Aetna to issue the FRIP based on material misrepresentations designed and intended to defraud Aetna. Because the FRIP was issued

in reliance on material misrepresentations, it is void from its inception. *Masters, Mates & Pilots Pension Plan, supra,* at 52.

■ Notwithstanding its misrepresentations, the Welfare Fund attempts to assert that Aetna was contractually obligated by the extension clause contained in the 1990–1991 FRIP to renew the FRIP for another year. The argument is without merit. Section X affords an insured, whose policy has been terminated or cancelled, the option to "be insured for an additional period of twelve (12) months after the effective date of termination or cancellation ... for claims made against the Insured during the said twelve (12) month period by reason of a Wrongful Act committed or alleged to have been committed prior to the effective date of termination or cancellation." Thus, this section allows the insured to extend the period to report claims by 12 months for claims arising out of acts committed prior to the termination or cancellation. Since the 1990–1991 policy was never terminated or cancelled, the extension clause never came into effect. Because the policy issued based on the 1991 renewal application, which covered "claims first made during the policy period [*i.e.,* March 23, 1991 to March 23, 1992]," is void from its inception, the Welfare Fund could not exercise the section X option under that policy.

Because the FRIP is void from its inception, to the extent the Welfare Fund seeks payment from Aetna under the FRIP to cover a purported settlement of the State Mutual action for $325,000, such claim fails.

Accordingly, Aetna is directed to return the $3,106.50 in premiums paid to it by the Welfare Fund, and G & H is directed to pay back to Aetna, for the benefit of the Welfare Fund, the $63,355.51 in legal fees paid by Aetna to G & H.

II. *G & H's Legal Fees Claim*

■ Based on this Court's determination that the FRIP was issued in reliance on

material misrepresentations and is void from its inception, and considering (1) Goldweber's participation in the material misrepresentations intended and designed to defraud Aetna, and (2) Goldweber's and Hershkowitz's participation in the associated member scheme, G & H's claim for legal fees is rejected. Aetna's obligation to pay for the insureds' defense in the Blue Cross and State Mutual actions depended on the existence of valid fiduciary responsibility coverage provided by the FRIP. *See Masters, Mates & Pilots Pension Plan, supra,* at 49–51. Moreover, even if Aetna's retention of G & H to represent the insureds is viewed as independent of the FRIP, G & H still should not recover because of Goldweber's participation in the material misrepresentations intended and designed to defraud Aetna, Goldweber's and Hershkowitz's participation in the associated member scheme, and G & H's acceptance of the matter despite undisclosed conflicts of interest. Under these circumstances, G & H must return to Aetna the legal fees of $63,355.51 paid to G & H pursuant to the rescinded FRIP. If G & H were permitted to retain legal fees paid by Aetna under the rescinded policy, the Welfare Fund and trustees would be unjustly enriched, all to the profit of Goldweber and Hershkowitz.

Although, as previously stated, this Court is troubled by Aetna's questionable diligence in (1) reviewing materials from the Blue Cross and State Mutual actions, and in determining to retain Goldweber and G & H to defend its insureds in those actions; and (2) reviewing G & H's bills for services and paying G & H $63,355.51 before refusing to pay further, this Court cannot condone Goldweber's and Hershkowitz's conduct in accepting that legal work in face of the undisclosed conflicts of interests and their roles in the material misrepresentations concerning the 1991 renewal application and in the associated member scheme.[2]

2. As further grounds for rejecting G & H's claim for legal fees, Aetna offered testimony that (1) G & H misrepresented its regular billing rate, which purportedly was only $125 to $135 per hour, not $225 per hour, at the relevant time, and, therefore, Aetna's agreement with G & H is

void and unenforceable; and (2) G & H padded its bills with double entries, redundant interoffice conferences, administrative activities, and work performed in actions other than the Blue Cross and State Mutual actions, and, therefore, made it impossible to determine which, if any, of the

## CONCLUSION

For the above reasons, the FRIP is rescinded and Aetna is directed to return to the Welfare Fund the $3,106.50 in premiums paid by the Welfare Fund to Aetna, and G & H is directed to return to Aetna, for the benefit of the Welfare Fund, the $63,355.51 in legal fees paid by Aetna to G & H. The Clerk of the Court is directed to enter judgment (1) in favor of Aetna and against the Welfare Fund and its trustees, declaring the FRIP rescinded and directing Aetna to return to the Welfare Fund the $3,106.50 in premiums paid by the Welfare Fund to Aetna; and (2) in favor of Aetna and against G & H, denying G & H's claims and directing G & H to return to Aetna, for the benefit of the Welfare Fund, the $63,355.51 in legal fees paid by Aetna to G & H.

SO ORDERED.

tasks it performed might otherwise have been covered by Aetna's policy. In addition, Aetna claims that G & H failed to prove its claim because it failed to produce in discovery and to place in evidence at trial the time records prepared contemporaneously with the work claimed to have been performed. Because this Court rejects G & H's claim for legal fees on other grounds, it need not determine whether G & H's claim fails due to an alleged misrepresentation of the billing rate, fraudulent billing, or failure of proof.