CHICAGO INSURANCE COMPANY,
Plaintiff,

v.

KREITZER & VOGELMAN, David M.
Kreitzer, Donald H. Vogelman, Daniel
W. Pariser and Pariser & Vogelman,
Defendants.

No. 97 Civ. 8619(RWS).

United States District Court,
S.D. New York.

June 2, 2003.

Steinberg & Cavaliere, White Plains, NY (Ronald W. Weiner, of counsel), for plaintiff.

James E. Musurca, White Plains, NY, for Defendants Kreitzer & Vogelman and David M. Kreitzer.

## OPINION

SWEET, District Judge.

Plaintiff Chicago Insurance Company ("CIC") initiated this action against defendants Kreitzer & Vogelman ("K & V"), David N. Kreitzer ("Kreitzer"), Donald H. Vogelman ("Vogelman"), Daniel W. Pariser ("Pariser") and Pariser and Vogelman ("P & V") (collectively the "Defendants"), seeking a declaratory judgment that CIC properly rescinded two lawyer's professional liability insurance policies (the "Policies") issued to K & V on the ground that the applicant made material misrepresen-

tations to induce CIC to issue the Policies. The Defendants have denied that CIC is entitled to rescind the Policies and filed a counterclaim requesting a judgment that CIC has a duty to defend and indemnify the Defendants under the terms and conditions of the Policies. After a trial before the Court and upon all the prior proceedings and the findings and conclusions set forth below, judgment will be granted in favor of CIC, as set forth below.

### The Issue

Two questions were at issue at trial. First, and more easily, CIC sought to prove that Kreitzer's failure to document his disciplinary troubles and a number of potential claims on his application for insurance were material, *i.e.*, whether the knowledge thereof would have resulted in CIC not issuing the particular Policies.

The second question is more difficult. The Defendants argue that CIC has waived its ability to rescind the Policies by accepting a premium after it had knowledge of a number of actual claims filed against K & V and at least one employee had knowledge that Kreitzer had been suspended from practice. In addition, they argue that waiver occurred because CIC acted unreasonably in waiting from Spring of 1997 until November 1997 to rescind the Policies. The Defendants also argue, alternatively, that CIC should be estopped from rescinding the Policies because of detrimental reliance they have suffered.

The real problem, it seems, began in December 1994 when Kreitzer failed to be perfectly honest about his difficulties. Had he properly filled out the application, CIC potentially would have rejected it, at which time he might have had the opportunity to purchase tail coverage from his former insurer. Alternatively, Kreitzer could have paid a higher premium and faced greater restrictions, but he would have had insurance coverage from CIC.

Unfortunately, given Kreitzer's behavior and the fact that CIC acted within the bounds of reason in its decision to rescind, it must be found that Kreitzer had no right to the Policies and, likely, that his former clients who now seek recompense for Kreitzer's behavior will not receive their due. Although it is easier said than done, forthrightness from the very beginning would have saved Kreitzer—and his former clients—a great deal of time, trouble and money.

### Prior Proceedings

This action was commenced on November 19, 1997. The Defendants filed their counterclaim on January 27, 1998.

CIC moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 on May 3, 1999. Several of the defendants cross-moved for summary judgment on the same date. The motions, which were marked fully submitted after oral argument on September 15, 1999, were both denied on January 10, 2000. In the opinion, it was held that CIC had failed to establish that no issue of fact was presented regarding the materiality of the misrepresentations. Because CIC improperly relied only on the conclusory affidavit of an underwriter without reference to supporting documentation such as manuals, rules or bulletins, CIC's motion was denied. The Defendants' motion was also denied, based on a finding of a triable issue of fact with regard to the timing of CIC's rescission under a theory of estoppel or waiver.

CIC filed another summary judgment motion on January 9, 2002, and the Defendants cross-moved on March 19, 2002. On July 2, 2002, those motions were denied. CIC's motion was denied for primarily the same reason as discussed above, in that it had merely submitted the affidavit of an underwriter without any recourse to sup-

porting documentation. Similarly, the Defendants' motion on the waiver claim was again denied based on a finding of a material issue of fact as whether a waiver occurred. Because the Defendants failed to object to CIC's motion to dismiss the estoppel claim, however, that claim was dismissed.

On March 27, 2003, pursuant to a stipulation, the action was discontinued as against defendants Pariser and P & V.

A bench trial was held on March 31, 2003. CIC called two witnesses: Diane Fiel, who was in charge of CIC's underwriting operation regarding legal malpractice policies during the relevant time ("Fiel"); and Sharon Eure Burns, a claims attorney manager at CIC. The Defendants called Kreitzer as their sole witness. Post-trial briefing and final arguments were completed on April 30, 2003.

### Findings of Fact

The following constitute the findings of fact of this Court and are based upon the trial, exhibits, and the proposed findings of facts from the parties.

### CIC's Foray into Legal Malpractice Coverage

CIC began underwriting legal malpractice policies in early 1995 after Bertholon–Rowland Corporation ("Bertholon"), the managing general agent for the Home Insurance Company of Indiana ("Home Insurance"), approached CIC to take over the New York State Bar Association's program that was previously underwritten by Home Insurance. The program involved more than 10,000 policies worth more than $40 million annually in premiums. As part of the agreement, CIC agreed to renew as many of the Home Insurance insureds as possible for the first year of the program.

CIC's underwriting guidelines dated January 23, 1995 state as follows, in pertinent part:

### Renewal Business Underwriting

The renewal evaluation process needs to begin at least 120 days before expiration. In reviewing those accounts, the following criteria will apply:

- Send renewal application at least 120 days before expiration date. The Company approved solicitation letter MUST accompany the solicitation. The solicitation letter will outline any changes in form or rate since the last renewal.
- Renewal applications may be used with current Home insureds.

Underwriting Guidelines, at 12.

### The 1995 Policy

On December 30, 1994, Kreitzer executed and delivered to CIC an application (the "Application") on behalf of K & V for a lawyer's professional liability insurance policy for claims during the period of March 26, 1995 to March 26, 1996 (the "1995 Policy"). The Application states in bold type on the first page that **"THIS IS A RENEWAL APPLICATION FOR CLAIMS MADE AND REPORTED PROFESSIONAL LIABILITY POLICY."** The Application was on a Home Insurance form and bore the name of Home Insurance and the Home Insurance logo on the first page. The Application stated that it would be incorporated in and become a part of any insurance policy issued pursuant to the Application.

The Application was referred by CIC's agent, Bertholon, to CIC for underwriting purposes due to the fact that the Application reported several actual claims against K & V. CIC was not bound by certain underwriting guidelines furnished by CIC to Bertholon when it reviewed the Application for underwriting purposes.

In reliance on the Application, CIC issued the 1995 Policy, bearing number

LWB–3007068–0, on October 2, 1995. At the time of its issuance, CIC was aware of four claims against K & V, one of which was more than five years old and thus disregarded. The amount of liability for two of the three remaining claims totaled $126,000. Because of these claims, CIC increased the premium by 10%.

In the Application, Kreitzer did not disclose that there were approximately twenty-eight potential claims. Kreitzer also did not disclose that there were charges filed against him with the Departmental Disciplinary Committee for the Appellate Division of the Supreme Court of the State of New York for the First Judicial Department (the "Disciplinary Committee"). In fact, he left blank the answer to the relevant question. Neither Bertholon nor CIC followed up to determine why he did not fill in the blank.

Kreitzer testified at trial that he did not answer the question because he was unsure of its meaning. The unanswered question reads: "During the last three years, has any lawyer in Question 3 been the subject of a reprimand or disciplinary action or refused admission to the bar by any bar association, court or administration agency?" At that time, Kreitzer testified that because he was only under investigation but no disciplinary action had yet occurred, he did not know how to answer the question. While clever, Kreitzer's explanation lacked credibility and does not change the fact that, as determined below,

his unanswered question was a material misrepresentation by way of omission.

The Defendants agree that the statements in the Application were the representations of K & V, that such representations were material,[1] and that CIC issued the Policy in reliance on the truth of such representations.

If CIC had been aware of the above misrepresentations, it would have issued a policy under "very different terms," including potentially (1) restricting prior acts, (2) restricting limits of liability, (3) including defense costs inside the limits of liability, and (4) charging a significantly higher premium. CIC likely would not have refused to issue any policy, however, as it had agreed with the NYSBA to attempt to cover as many of the former Home Insurance insureds as possible.

### The Renewal Policy

On March 6, 1996, Kreitzer executed and delivered to CIC another application (the "Second Application") on behalf of K & V for a lawyer's professional liability policy for claims during the period of March 26, 1996 to March 26, 1997 (the "Renewal Policy"). The Second Application was a "simplified renewal application" that was intended to be used for relatively low-risk insureds. Testimony at trial revealed that K & V presented an above-average risk.

The Second Application was referred by Bertholon to CIC for underwriting purposes. CIC was again not bound by certain underwriting guidelines when it

---

1. The Defendants claim in their brief that they did not address the issue of materiality because of a purported ruling from the bench that the misrepresentations were material. There was no such ruling. The transcript reveals only a prediction that the arguments would likely turn on the issue of knowing waiver: "I think the only serious problem we have, although I am delighted to get anything that you all want, is this question of knowing waiver. I would sort of suggest that is where the main thrust ought to be. You can give me anything you want." Transcript, March 31, 2003 trial, at 116–17. As a result, there was no ruling that there was a material misrepresentation and any failure by counsel to raise the issue now constitutes an admission that it was material. In any case, CIC's arguments that the misrepresentation was material are persuasive as discussed *infra*.

reviewed the Second Application. In reliance on the Second Application, CIC issued the Renewal Policy, bearing number LWB–3007068, in March 1996. Prior to issuing the Renewal Policy, CIC had knowledge of five actual claims that had been filed against K & V from February 1993 through March 1995. As a result of these claims, totaling more than $200,000 in liability, the premium was increased by approximately 73%.

Again, Kreitzer failed to disclose in the Application the disciplinary proceedings and approximately 30 claims. Had Kreitzer disclosed these facts, CIC would not have issued the Renewal Policy because they were under no obligation to the NYS-BA to do so. If CIC had not renewed, K & V would have been entitled to unlimited tail coverage under the same terms of the 1995 Policy. If the 1995 Policy had been rescinded, however, such tail coverage would not have been available.

The Defendants agree that the statements in the Application were the representations of K & V, that such representations were material, that such representations were false, and that CIC issued the Policy in reliance on the truth of such representations.

On February 18, 1997, Kreitzer was suspended from the practice of law for a period of three years based upon charges filed by the Disciplinary Committee. *In the Matter of David M. Kreitzer*, 229 A.D.2d 188, 653 N.Y.S.2d 572 (1st Dep't 1997).

On April 22, 1997, CIC issued an endorsement to the Renewal Policy in accordance with the provisions of the policy, extending for an unlimited period the time allowed thereunder for reporting claims. Prior to the issuance of the endorsement, CIC had received reports of five additional actual and/or potential claims against Kreitzer.[2]

### Incidents Prior to Kreitzer's Obtaining Tail Coverage and Paying a Premium Therefor

On March 14, 1995, defendant Pariser had a conversation with Paul Calamari, Esq. ("Calimari"), the regional director of CIC. In that conversation, Pariser informed Calimari that Kreitzer had been suspended from the practice of law and that Pariser was taking over management of the firm. The Defendants' claim that Pariser informed Calamari of a "multitude" of legal malpractice claims during that phone conversation is not sufficiently corroborated by evidence.[3]

By letter dated April 17, 1997, Bertholon requested payment of $63,467 for Kreitzer's purchase of an unlimited extended reporting period endorsement (tail coverage). CIC issued the tail coverage on April 22, 1997, extending for an unlimited period the time allowed for reporting claims. The premium for tail coverage was received by Bertholon on behalf of CIC on April 22, 1997. Also on April 22, 1997, CIC received notice of a claim against Kreitzer by former client Tartaglia.

### CIC's Investigation into Multiple Potential Claims

By letter dated May 16, 1997, CIC first received written notice of multiple poten-

---

**2.** These include claims by the following former clients: (1) Jaques Cohen in March 1996; (2) Helen Dietch in August 1996; (3) Valerio in September 1996; (4) Ann Mafia in October 1996; and (5) John Molina in January 1997.

**3.** By letter dated March 19, 1997, Pariser confirmed with a Bertholon agent his discussions with Calamari. The letter does not speak of any "multitude" of legal malpractice claims. Indeed, Pariser's primary concern is to limit the liability of P & V, not K & V.

tial claims against Kreitzer or K & V, arising out of K & V's representation of plaintiffs in personal injury actions. In the letter, Pariser advised Bertholon and CIC of eleven specific additional potential claims, stating that the majority of these cases "are or will be dismissed based upon Mr. Kreitzer's neglect." Pariser also informed in this letter that his office was in the process of reviewing approximately 2,500 files from Kreitzer, some of which likely were not viable due to neglect. CIC continued to receive such written notices regarding multiple potential claims against Kreitzer and/or K & V from May to November 1997.[4] From May to October 1997 alone, CIC received written notice from P & V of more than 100 potential claims against Kreitzer and/or K & V.

In early June 1997, CIC retained coverage counsel to conduct a coverage investigation as a result of the May 16, 1997 letter. From early June 1997 through November 12, 1997, CIC's coverage counsel conducted a coverage investigation with respect to the potential claims reported by P & V. The investigation included the review of dozens of K & V files at issue, legal research, and an analysis of potential coverage issues as to each reviewed file. From early June 1997 through November 12, 1997, coverage counsel regularly communicated with CIC with respect to its coverage investigation and analysis, both verbally and in writing. These discussions raised many questions concerning CIC's rights and obligations under the Policies with respect to the potential claims.

In July 1997, CIC was first advised of coverage counsel's findings with respect to the review of thirty-three of the potential claims about which CIC had received written notice from P & V. At that time, CIC first learned of eighteen potential claims that existed at the time the Application was executed and of five potential claims that existed at the time the Second Application was executed, and that Kreitzer had failed to disclose any of these matters on the Applications. At the time, CIC also first learned that the Disciplinary Committee had filed twenty-six charges against Kreitzer for the neglect of twelve client matters before the Application was executed, and that Kreitzer had failed to disclose such charges in the Application. Coverage counsel informed CIC that it had a 60% chance of any rescission of the Policies being upheld based on these findings. This prediction was subject to further investigation by CIC's underwriting department. Also in July 1997, CIC was first advised of its coverage counsel's analysis of other issues bearing on the dozens of potential claims reviewed by that time, such as possible rescission of the Policies and CIC's options in response to the potential claims.

In August 1997, CIC was first advised of coverage counsel's findings with respect to its review of twenty-seven additional potential claims about which CIC received written notice beginning in May 1997. At that time, CIC learned of a total of fifteen potential claims that existed at the time the Application was executed and of a total of sixteen potential claims that existed at the time the Second Application was executed, and that Kreitzer had failed to disclose any of these matters in those applications. CIC was advised of coverage counsel's analysis of various other issues including further discussions of those cited above and, *inter alia*, representations possibly made by Bertholon to attorneys who were formerly affiliated with K & V, cancellation of the Policies and the effect of a

---

**4.** Although outside the relevant time period, such monthly notices continued to be sent to CIC for some unspecified period after November 1997.

possible bankruptcy filing by Kreitzer and/or K & V.

In September 1997, CIC was first advised of coverage counsel's preliminary discussions with CIC's underwriting department as to the underwriters' need to review and analyze documents and other items bearing on the materiality of Kreitzer's non-disclosures, Kreitzer's and/or K & V's probable responses if the Policies were rescinded, the commencement by CIC of a declaratory judgment action in the event the Policies were rescinded, and CIC's obligation to tender the premiums if rescission were pursued.

Later in September 1997, Robert Knowles, the senior vice president of Interstate Insurance Group, CIC's parent company, was furnished with information for his consideration of the coverage issues presented by Kreitzer's failure to disclose the numerous potential claims and the Disciplinary Committee's charges.

In October 1997, CIC was advised of coverage counsel's analysis of further issues concerning the possible rescission of the Policies, including whether one or both Policies should be rescinded and a proposed complaint to commence a declaratory judgment action.

Later in October 1997, CIC was advised of coverage counsel's analysis of further issues concerning the possible rescission of the Policies, including the parties to be named as defendants in a declaratory judgment action, the terms of a letter advising the Defendants of the rescission of the Policies, and the terms of a letter advising defense counsel to defend Kreitzer and/or K & V against the claims asserted prior to May 1997.

In an October 24, 1997 memorandum, CIC was advised of coverage counsel's analysis of issues pertaining to the infor-

mation furnished by CIC's underwriting department as to the materiality of Kreitzer's non-disclosures in the applications, including the steps underwriters could have taken had CIC known of Kreitzer's misrepresentations.

In November 1997, CIC was advised of coverage counsel's analysis of issues regarding the substantive and procedural aspects of the rescission of the Policies.

By letter dated November 12, 1997, CIC notified Kreitzer and K & V of its rescission of the Policies and tendered to them a refund of the premiums paid for the Policies.

Since the inception of the Renewal Policy, CIC has provided Kreitzer and/or K & V with a defense with respect to claims against one or both of them, and has paid $41,503.62 in total for such defense. In that period, CIC also has paid on behalf of Kreitzer and/or K & V $54,000 for the settlement of claims against one or both of them. Despite CIC's demand, Kreitzer and K & V have failed and refused to return and/or reimburse these sums.

### Conclusions of Law

The two issues presented at trial were whether the misrepresentations in the applications were material and whether CIC is equitably estopped from rescinding the Policies. While the Defendants did not address the first point, due to their belief that the issue had been resolved from the bench at the end of trial, the issue of materiality will nonetheless be addressed as there was no such ruling from the bench.

### I. *The Misrepresentations Were Material*

■■■ Under New York law,[5] an insurance policy issued in reliance on material

---

5. The parties agree that New York law applies.

misrepresentations is void from its inception. *Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan*, 77 F.3d 48, 52 (2d Cir.1996). The failure to disclose is as much a misrepresentation as a false affirmative statement. *Mutual Benefit Life Ins. Co. v. Morley*, 722 F.Supp. 1048, 1051 (S.D.N.Y.1989) (*"Morley"*). To demonstrate materiality, an insurer must show that the misrepresentation induced it to accept an application that it might otherwise have refused. *Vella v. Equitable Life Assur. Soc.*, 887 F.2d 388, 392 (2d Cir. 1989); *Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 32 (2d Cir.1988). The insurer need not show that it would not have issued the policy at all, but only that the policy in question would not have been issued. *Morley*, 722 F.Supp. at 1051. Even if a misrepresentation was made innocently or without the intent to deceive, it is sufficient to void the policy if it is material. *Kulikowski v. Roslyn Sav. Bank*, 121 A.D.2d 603, 503 N.Y.S.2d 863, 864 (2d Dep't 1986).

■ The testimony of Fiel and other evidence presented at trial support the conclusion that CIC at the very least would not have issued the Policy under the terms, conditions and premiums therein provided had it known the truth about Kreitzer's misrepresentations. Further, it would not have issued the Renewal Policy at all. No evidence to the contrary was presented at trial. As a result, CIC has met its burden of showing that the misrepresentations were material.

## II. *Waiver*

■ The Defendants assert as an affirmative defense that CIC has waived its ability to rescind. They therefore carry the burden to prove that waiver has occurred. *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir.2000).

■ Waiver is the voluntary and intentional relinquishment of a known right. *Albert J. Schiff Assocs. v. Flack*, 51 N.Y.2d 692, 698, 435 N.Y.S.2d 972, 975, 417 N.E.2d 84 (1980). Waiver requires evidence of a clear manifestation of intent, *K. Bell Assocs., Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985 (S.D.N.Y.1993), and cannot be "lightly inferred." *Mooney*, 219 F.3d at 131. *See also Port Distrib. Corp. v. Pflaumer*, 880 F.Supp. 204, 211–12 (S.D.N.Y.1995) (waiver must be clear, unmistakable and without ambiguity); *Metropolitan Life Ins. Co. v. Blum*, 7 A.D.2d 488, 491, 184 N.Y.S.2d 455, 457–58 (1st Dep't 1959) (negligence or oversight insufficient to establish waiver).

■ The parties have presented competing sets of case law on the question of waiver in the insurance context. The Defendants rely on cases where insurers have accepted and retained premiums with the knowledge of events that they claim justify rescissions of the policies in question. *E.g., Scalia v. Equitable Life Assurance Soc. of U.S.*, 251 A.D.2d 315, 673 N.Y.S.2d 730 (2d Dep't 1998); *Continental Ins. Co. v. Helmsley Enterprises, Inc.*, 211 A.D.2d 589, 622 N.Y.S.2d 20 (1st Dep't 1995). An important facet of this case law, however, is that the insurers have "sufficient information" of the grounds for rescission. *Scalia*, 673 N.Y.S.2d at 731. Here, CIC accepted its last premium from the Defendants on April 22, 1997. The Defendants have not met their burden of showing that prior to April 22, 1997, CIC had "sufficient knowledge" of Kreitzer's misrepresentations such that a waiver should apply. The only information known to CIC was that (1) Kreitzer had been suspended from the practice of law, and (2) ten actual claims had been filed against K & V from 1993 to 1996. Such information was not sufficient knowledge of the grounds for rescission such that CIC waived its rights

to rescind following its receipt of the K & V premium in April 1997. Indeed, as noted below, CIC did not become aware of the large number of potential claims until, at the earliest, mid-May 1997.

 The Defendants argue that CIC essentially avoided knowledge with its failure to investigate why Kreitzer did not answer the pertinent questions on the applications. Such argument is unavailing. An insurer is not required to verify or investigate information provided by an insured. *Friedman v. Prudential Life Ins. Co.*, 589 F.Supp. 1017, 1023 (S.D.N.Y. 1984). Further the blank answer did not, in any case, constitute "sufficient knowledge" such that CIC's later acceptance of the premium was a waiver.

By contrast, CIC relies on case law establishing insurers' right to a reasonable time to investigate a possible rescission and assert such a claim. *E.g., Republic,* 77 F.3d at 53 (insurer's investigation from "late 1988 or early 1989" when it first obtained information concerning the insured's misrepresentations to the insurer's assertions of a claim of rescission on May 24, 1989 was reasonable); *The Aetna Casualty and Surety Co. v. Retail Local 906 of the AFL–CIO Welfare Fund,* 921 F.Supp. 122, 132 (S.D.N.Y.1996) (*"Local 906"*) (finding no waiver where one year passed between time insurer first received information bearing on possible rescission and insurer's commencement of action to rescind).

This case law is more germane to the matter at hand. The Defendants have not established that CIC acted unreasonably in investigating the large number of potential claims. The evidence showed that CIC engaged coverage counsel in June 1997, a few weeks after receiving notice of the large number of potential claims against K & V. The evidence also showed that coverage counsel engaged in an ex-tremely fact-intensive investigation of those claims, as well as a thorough legal analysis. CIC was attempting to determine whether it could rescind, and the expenditure of six months of investigation into that issue is not unreasonable. Indeed, public policy supports the allowance of such a reasonable investigation; it would be unwise to give insurers an economic incentive to rescind insurance at the drop of a hat and without sufficient investigation. Such willy-nilly actions would obviously result in less insurance coverage, but also would engender countless lawsuits such as this one.

As a result, the Defendants have not met their burden to establish that CIC has waived its ability to rescind the Policies.

### III. *Defendants' Other Arguments*

The Defendants have raised two arguments in their papers that will be addressed, given their clear lack of merit, even though these arguments were not directly addressed at trial and CIC had no notice of the arguments until it received the post-trial papers. First, the Defendants argue that CIC is estopped from rescinding the policy. Next, they argue that CIC was required to give them tail coverage because CIC took over the Home Insurance policy.

#### A. *Estoppel*

 Because the Defendants did not oppose CIC's motion to dismiss the estoppel affirmative defense in the second set of summary judgment motions in this action, that defense was dismissed. They nonetheless seek to reinstate the defense at this time.

 Estoppel is distinct from waiver under New York insurance law. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 95 (2d Cir.2002) (*citing*

*Albert J. Schiff Assocs., Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 975, 417 N.E.2d 84 (1980)). It "arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment." *Id.* The typical example of such behavior is when an insurer, though not in fact obligated to provide coverage, defends a case without asserting any policy defenses and as a consequence the insured reasonably suffers the detriment of losing control over its defense. *Id.*

The Defendants base their argument entirely on the detrimental reliance prong. They assert that K & V would have obtained tail coverage from Home Insurance had CIC acted appropriately.

It has been established that CIC's inaction, of which the Defendants complain, began in mid-May 1997. In mid-May 1997, the Defendants no longer had the luxury of obtaining the Home Insurance tail coverage. Any insurance they then procured would necessarily have involved prospective, rather than retroactive, coverage. Therefore, the Defendants have failed to establish detrimental reliance.

The only inaction on the part of CIC at the time when the Home Insurance tail coverage was still available was its failure to investigate the blank answer on Kreitzer's applications. Yet, as determined above, an insurer has no duty to so substantiate an applicant's answers. *Friedman,* 589 F.Supp. at 1023. In the absence of such a duty and in the absence of any other circumstances that would suggest that the Policies should not have been issued as they were, CIC's actions do not constitute inaction so as to support a finding of equitable estoppel.

**B. Tail Coverage**

 The Defendants argue that CIC is required to provide tail coverage because Home Insurance would have been required to do so at the time prior to the issuance of the Policies.[6] To support this argument, the Defendants point to the fact that CIC used Home Insurance forms and treated as renewals all policies issued as a result of its assumption of Home Insurance's business with the New York State Bar Association.

The Defendants do not provide any legal underpinnings for this theory. They have failed to present any evidence of an agreement between CIC and the Defendants that CIC would assume Home Insurance's obligations to provide tail coverage.

In any case, this argument makes no sense. It is true that CIC accepted Home Insurances' insureds—and the $40 million in premiums—as its own. Yet such acceptance did not mean that CIC was required to provide tail coverage, instead of actual coverage, for any of the more than 10,000 potential customers. Its obligation was to take over the coverage and, if CIC's coverage was cancelled, to provide tail coverage at the conclusion of its policies as is statutorily required.

In the absence of any compelling legal or factual argument to the contrary, the Defendants simply have not established any means by which CIC could have accepted Home Insurance's obligation to provide tail coverage before the CIC policies even began.

---

**6.** This argument is distinct from an earlier argument that, despite rescission, CIC was required to provide tail coverage after its rescission of the Policies. *Chicago Ins. Co. v. Kreitzer,* slip op., at 23 (Jan. 5, 2000) (*Local*

*906,* 921 F.Supp. at 132). Because rescission rendered the Policies were void *ab initio,* it was held that CIC had no duty to provide tail coverage. *Id.*

### Conclusion

Based upon the findings of fact and conclusions of law set forth above, it is determined that CIC properly rescinded the Policies on the ground that the applicant made material misrepresentations to induce CIC to issue the Policies. Further, CIC has not waived its right to do so, nor is estopped from so doing. Finally, CIC is not obligated to provide tail coverage as provided for in the Home Insurance policy.

In addition, the Defendants' counterclaims to the contrary are rejected. CIC does not have a duty to defend and indemnify the Defendants under the terms and conditions of the Policies.

Settle judgment in accordance with this opinion as of June 15, 2003, upon ten (10) days' notice.

It is so ordered.